## Lara L. BATTLESON

### v.

## Dean L. BATTLESON.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Sept. 21, 2006 Session.

Oct. 20, 2006.

Permission to Appeal Denied by Supreme Court Feb. 26, 2007.

Douglas R. Beier, Morristown, Tennessee, for the Appellant, Dean L. Battleson.

Thomas C. Jessee, Johnson City, Tennessee, for the Appellee, Lara L. Battleson.

## OPINION

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

In this post-divorce case, Mr. Battleson petitioned the trial court to modify the parties' parenting plan and designate him as the primary custodial parent of the parties' two minor children. After a hearing, the trial court (1) *sua sponte* held Mr. Battleson in civil contempt and awarded Ms. Battleson her attorney's fees and the cost of her medical expert's deposition as sanctions; (2) found no material change in circumstances justifying the change of primary parenting responsibility from Ms. Battleson to Mr. Battleson; and (3) clarified an ambiguous portion of the parenting plan regarding Mr. Battleson's one week per month visitation of the younger child. After careful review, we hold that the trial court erred in holding Mr. Battleson in civil contempt and in awarding Ms. Battleson attorney's fees and costs when Ms. Battleson did not request such relief. We affirm the trial court's refusal to change primary parenting responsibility from Ms. Battleson to Mr. Battleson and affirm the trial court's clarification of the parenting plan.

### I. Background

The parties were divorced following a contested hearing in July of 2004. Ms. Battleson was designated the primary residential parent of the parties' two children, Seth, age 4, and Sundae, age 2. Mr. Battleson was granted specified residential parenting time and was prohibited from taking the children to a healthcare provider during his visitation unless there was an emergency. Immediately after the divorce and with the trial court's permission, Ms. Battleson moved with the children to Winston–Salem, North Carolina.

Less than five months after the divorce was granted, Mr. Battleson filed a petition to modify the parenting plan, requesting that the trial court make him primary residential parent. The petition alleged

that "at least 2 physicians had diagnosed Sundae with failure to thrive and severe concerns were raised regarding Seth." After a failed attempt at mediation, a hearing was held on October 27, 2005. The only witnesses to testify were the parties and their respective medical experts, both of whom were Sundae's treating physicians. Ms. Battleson did not file a written pleading prior to the hearing.

The trial court denied Mr. Battleson's petition, and held, *sua sponte,* that he was "in contempt of Court twenty-five times for taking the minor child [Sundae] to the doctor when there was no emergency, in violation of this Court's Order." As a sanction for contempt, the trial court ordered Mr. Battleson to pay the deposition expense of Ms. Battleson's medical expert. The trial court further found Mr. Battleson "in contempt of Court a twenty-sixth time for his failure to follow this Court's Order to provide [Ms. Battleson] with his tax information" and, as a sanction, ordered Mr. Battleson to pay Ms. Battleson's attorney's fees. The trial court found that there had been a substantial change in the parties' incomes, ordered that child support be recalculated pursuant to the current guidelines, and made a couple of minor, apparently uncontested, changes to the parenting plan. The trial court ordered that "in all other respects, all other co-parenting times set forth in the original Order shall remain the same."

On December 1, 2005, Ms. Battleson filed a motion for an order modifying the parenting plan as it related to holidays and "to clarify all other parenting times." Ms. Battleson stated that "the basis for this motion is that the Court's recent order was unclear as to how the Court intended visitation to occur at times other than every other weekend." At issue was Mr. Battleson's one week per month visitation with Sundae, the younger child. The parenting plan approved by the trial court provided that the children shall reside with Mrs. Battleson except the week or weeks per month when Mr. Battleson was off from work. The parenting plan further stated:

Upon enrollment in school, the children shall reside with the Mother except from 3:00 on Friday to 5:00 p.m. on Sunday, every other weekend.

(x) "THE SCHOOL SCHEDULE WILL START *WHEN EACH CHILDREN* [sic] *BEGINS* KINDERGARTEN."

(Emphasis in original).

After a second hearing, the trial court entered its final order ruling in pertinent part that Mr. Battleson "shall have visitation with the minor children every other weekend and shall no longer be entitled to every third week with the child who is not yet in school." The trial court made it clear that it considered this ruling to be a clarification of its prior ambiguous order, and not a modification, stating as follows:

Well, the Court attempted to articulate its findings and its conclusions in a clear manner. I think I've failed because of that worrying about if this isn't changed, then the other order remains in effect. And as a result of me saying that, and I said it, this third week appeared on the radar screen. So I did say it. And so, yes, about—my very words, the father should have been entitled to that third week with the daughter, but that was not what I intended. I intended for the father to have coparenting time with his children at a minimum every other weekend Friday to Sunday, one-half of the holidays, plus, the phone visitations, plus all the other—plus, the written visitations, coparenting they can have per the parenting order.

So the Court finds that sure enough, I did have those words and by those words in my opinion I did—indirectly

the father is entitled to the third weekend. But that was not what I intended. So I intended that the children be with their dad every other weekend at a minimum Friday to Sunday or whatever I said.

## II. Issues Presented

Mr. Battleson appeals, raising the following issues for our review:

(1) Whether the trial court erred in refusing to modify the parenting plan to designate him as the primary residential parent;

(2) Whether the trial court erred by finding him in civil contempt of court in the absence of a request by Ms. Battleson to hold him in contempt;

(3) Whether the trial court erred in modifying the parenting plan to eliminate his one week per month parenting time with the younger child; and

(4) Whether the trial judge should be recused from hearing further matters in this case.

## III. Standard of Review

We review this non-jury case *de novo* upon the record of the proceedings below, with a presumption of correctness as to the trial court's findings of fact "unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn.1984). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn.1999). There is no presumption of correctness with regard to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35

(Tenn.1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn.1993).

## IV. Analysis

### A. Child Custody and Visitation

Mr. Battleson argues that the trial court should have granted his petition to change custody from Ms. Battleson to him. We disagree with this argument because the evidence does not preponderate against the trial court's finding that there was not a material change of circumstances justifying a change of primary residential parent. Trial courts are vested with wide discretion in matters of child custody; as the Supreme Court has noted on several occasions, the details of custody and visitation with children are "peculiarly within the broad discretion of the trial judge." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn.1988). A determination of custody and visitation often hinges on subtle factors such as the parents' demeanor and credibility during the trial proceedings. *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn.Ct.App.1996). Absent some compelling reason otherwise, considerable weight must be given to the trial court's judgment with respect to the parties' credibility and their suitability as custodians of children. *Bush v. Bush*, 684 S.W.2d 89 (Tenn.Ct.App.1984). In cases such as this, the welfare and best interests of the child are of paramount concern. T.C.A. § 36–6–106(a); *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn.Ct.App.1993).

We are aware of the tremendous impact a custody decision has on the life of a child. Although trial courts must be able to exercise broad discretion in matters of child custody and visitation, they still must base their decisions on the proof and upon the appropriate application of the pertinent principles of law. *D v. K,*

917 S.W.2d 682, 685 (Tenn.Ct.App.1995). We will not reverse a trial court's decision regarding custody unless the record clearly demonstrates that the trial court has abused its discretion. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn.1992). A discretionary judgment of a trial court should not be disturbed unless it affirmatively appears that "the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." *Marcus v. Marcus,* 993 S.W.2d 596, 601 (Tenn.1999) (quoting *Ballard v. Herzke,* 924 S.W.2d 652, 661 (Tenn.1996)).

■ In the present case, the basis for Mr. Battleson's petition was his allegation that Ms. Battleson has not been responsible for properly taking care of the children's health, and that Sundae has routinely been sick and has been diagnosed with failure to thrive because of her inability to gain weight. Mr. Battleson presented the testimony of Dr. H. Patrick Stern, the physician to whom he regularly took Sundae while exercising his parenting time in Tennessee. Dr. Stern stated that "I believe I've seen [Sundae] probably most every visitation [with Mr. Battleson] at least once, sometimes twice. And she's been chronically ill." Dr. Stern first saw Sundae in October of 2004, and between then and the date of the hearing, October 27, 2005, Mr. Battleson took Sundae to Dr. Stern twenty-five times.

Regarding Sundae's alleged failure to thrive, Mr. Battleson told Dr. Stern at their first meeting in October of 2004 that "Sundae had previously been diagnosed with failure to thrive in February 2004." Dr. Stern testified that the major concern expressed by Mr. Battleson was Sundae's inability to gain weight, and that she had essentially gained no weight between the ages of 18 months and 25 months. Dr. Stern stated that "the review of the previous medical records reviewed [sic] that she had dropped in weight from the 50th percentile at six months of age to below the third percentile at our visit." However, Dr. Stern also testified that from her eighteenth month to the time of the hearing when she was 37 months old, Sundae had gained about seven pounds, and that "her rate of growth between those two points has actually been what you'd expect if that was her normal percentile." At the time of the hearing, Sundae's weight was between the 20th and 25th percentile.

On many, if not most, occasions that Mr. Battleson took Sundae to Dr. Stern, the doctor prescribed antibiotics for her. On some occasions, Dr. Stern also prescribed steroids and Singulair for what he perceived as her allergy problems. Ms. Battleson presented the deposition testimony of Dr. John H. Myracle, her treating physician in North Carolina. Ms. Battleson testified that each time Sundae came home from her father's with a prescription, she took Sundae to Dr. Myracle to have Sundae checked. Dr. Myracle's testimony presented a very different picture of Sundae's general health and condition:

> There's been, since the check-up when I first saw her at two years of age there's been steady improvement. That was, I think, about the time they moved to Winston–Salem, but, but you can look at the growth chart and I think it tells a nice picture of a child that's thriving. Her weight had increased, has increased since that time from the 8th percentile up to the 25th percentile and her ... height is also following the 25th percentile, so there's been a, in terms of her emotional development, her physical development I think she's, she's a delightful child and is thriving.

Dr. Myracle testified that there had been frequent occasions where his examination of Sundae after her visitation in Tennessee

led him to conclude that her prescriptions were medically unwarranted, stating as follows:

They just returned from Tennessee, saw Dr. Stern. She had been placed again on the combination of erythromycin and sulfamethoxazole, Singulair and Prednisone, all three. Given two weeks worth of Prednisone. That's a pretty long course on a steroid. I was concerned then that there was this pattern that was evolving that every time they went to Tennessee they ended up getting antibiotics, Singulair and steroids, none of which, well, from, at the times that I saw her it didn't seem that that was indicated.

Dr. Myracle testified that he never saw any allergy symptoms on any occasion, and that it was "a little bit baffling to me that they were continually treated for allergy." Dr. Myracle testified that Ms. Battleson was adequately responsive to Sundae's health care needs and actively concerned about her health. Dr. Myracle testified that in his opinion, looking at Sundae's growth chart, "very few pediatricians would consider this failure to thrive."

Regarding Seth, the older child, there is relatively little in the record about the condition of his health. Dr. Myracle testified that Seth was "in the middle of the chart" around the 50th percentile in height and weight, and "I didn't see any sign that he was failing to thrive or having any health problems of any significance." Mr. Battleson testified that Seth is "doing fine," enrolled in kindergarten, and doing very well in school. Dr. Stern testified that Seth was not in his care, although he had seen Seth on occasion, and that he had never diagnosed Seth with failure to thrive.

After hearing and considering the testimony, the trial court found no material change of circumstance and declined to change custody. The evidence does not preponderate against this conclusion. According to Dr. Stern's testimony, Sundae was diagnosed with failure to thrive in February of 2004, before the hearing of the parties' divorce (May 18, 2004) and before the final divorce decree (July 22, 2004). The period of time Sundae did not gain weight was roughly from March of 2004 until October of 2004; more than half this period was before the final divorce decree. Moreover, there is no evidence that Sundae was failing to thrive at the time of the hearing of Mr. Battleson's petition. His own expert, Dr. Stern, testified at the hearing as follows:

Q: Have you read Dr. Myracle's notes where he said the child [Sundae] is good and in nutritional status [sic], eating varieties of fruits and vegetables and meats, is satisfactory weight and does not have failure to thrive?

A: Yeah, I don't think the child presently would fit the category of failure to thrive. I agree with him.

Despite this testimony from his own doctor, Mr. Battleson testified that the reason he believed the trial court should grant him primary residential parenting status is "Sundae's continuing failure to thrive and her earaches need to be resolved as soon as possible, and I don't think it's going to happen in our current situation." The evidence in the record clearly does not support this conclusion. As regards Seth, there is practically nothing in the record indicating a material change of circumstances regarding his health or other condition since the divorce. We affirm the trial court's judgment finding no material change of circumstances warranting a custody change.

The trial court delivered a lengthy oral memorandum opinion at the conclusion of the hearing. It is apparent from the transcript of the opinion, incorporated into the

trial court's judgment, that witness credibility was an important factor in its decision. Because the trial court's comments are pertinent to the issues presented, and because Mr. Battleson points to them as justification for his argument that the trial judge should be recused from hearing further matters in this case, we reproduce them at some length in relevant part as follows:

> This is the case where the parents of two youngsters ... have ripped and torn at the fabric of the legal system and I believe have ripped and torn the fabric of their children's well-being simply because Mrs. Battleson, the mother, the respondent here, and Mr. Battleson, the father, the movant here, could not agree on the time of day, much less an important consideration concerning their children.

> \* \* \*

> [T]he very major issue that I anticipated occurring has occurred. I saw very early on that Mr. Battleson would never accept the fact that he was the alternate residential parent ... I saw very early on that he was going to do everything he could, everything in his power to make sure that things happened where he would be the primary residential parent.

> \* \* \*

> I knew when I gave my opinion and signed this Parenting Plan and signed this Final Decree that the movant here, Mr. Battleson, would never be satisfied unless he had control, and he was going to get that control by playing upon any illness that the children had.

> \* \* \*

> Listen to this under [section] 3.2 [of the parenting plan]. "Major decisions regarding the child shall be made as follows: Educational decisions, mother; [non-]emergency health care, mother."

> Mother! Under health insurance, Page 10, 5.3 of the Parenting Plan, here's another quote. Just didn't make any difference to dad. He doesn't care what the Court says. He's going to-by golly, he's going to do what he's got to do to make sure he's the primary residential parent, and the Court can just do whatever it wants to. Listen to this quote. "The mother shall choose the healthcare providers for the children." Daddy does not choose the doctors for the children. He doesn't choose the dentist for the children. He doesn't choose anything dealing with healthcare for the children. I knew I would have to make the mother in charge. Otherwise, the dad would dispute it. I made the mother in charge. Dad disputed it anyway. Continuing the quote: "The father cannot take the children to a healthcare provider of his choice unless it's an emergency." He did. There's not an emergency in this record today, and he took his little girl to a doctor, and I'll talk about him in a minute, 25 times. Twenty-five times he violated my Order. Twenty-five times he chose the healthcare provider. Twenty-five times he took the child to a healthcare provider that was not an emergency. That's 25 contempts.

> \* \* \*

> Dr. Stern testifies today that these children, or at least Sundae is in bad shape, to hear him tell it. Dr. Stern, the Court finds, is exactly what he said he was. He said he wasn't a hired gun. I believe he is. He said he was here to advocate on behalf of the children. He wasn't here to advocate on behalf of her. I find he was here to advocate on behalf of the father.

> Dr. Stern has little or no credibility with this Court. It's unbelievable that a professional would do what he has done ...

If there's anything incredible, it's a lot of Dr. Stern's testimony.

\* \* \*

The father hires him a hired gun here in Tennessee, who starts prescribing for the child. The prescription of the doctor in Tennessee, Dr. Stern, is exactly contrary to what the child's specialist ear doctor had said in North Carolina.

\* \* \*

I find Dr. Stern was putting her on medicine she didn't need. Not only wasn't the child not supposed to have them, he was putting her on medication she didn't even need. He was here not as a doctor. He was here as an advocate to change custody.

\* \* \*

The movant is in contempt of Court. The Court finds that these children never suffered an emergency that justified him taking them to a doctor except once, a spider bite. I find that this man took these children to a hired gun doctor to get custody changed, and that the doctor over here, this hired gun, gave them medication, gave little Sundae medication she didn't need and may have hurt her. You're in contempt of Court, and not once but 25 times.

Well, if you go on and read Dr. Myracle's deposition, you'll find out that, hey, these kids have had nothing more than the normal childhood earaches and sniffles and such. These kids are okay developmentally, physically and emotionally. The problem is the daddy wanting to be the primary residential parent, and the problem [is] doctors like Dr. Stern, who will come into Court and say what needs to be said for his client.

Based on our finding that the evidence does not preponderate against the trial court's conclusion that there was no material change of circumstances, we affirm the trial court's judgment refusing to change custody of Seth and Sundae from Ms. Battleson to Mr. Battleson.

### B. Contempt

As a sanction for the 25 instances of civil contempt, the trial court ordered Mr. Battleson to pay Ms. Battleson's cost of Dr. Myracle's deposition. The trial court found Mr. Battleson in contempt a 26th time for his failure to provide tax information to Ms. Battleson as ordered in the divorce decree, and for sanction ordered Mr. Battleson to pay Ms. Battleson's attorney's fees. Mr. Battleson argues on appeal that the trial court erred in *sua sponte* holding him in contempt. Because Ms. Battleson never requested a finding of contempt prior to the trial court's ruling, we agree.

In the case of *State ex rel. Agee v. Chapman*, 922 S.W.2d 516 (Tenn.Ct.App. 1995), the court addressed the issue of whether a trial court may, on its own motion, impose sanctions on a finding of civil contempt, and concluded in the negative:

Civil contempt sanctions are imposed for the benefit of a party litigant. *Garrett v. Forest Lawn Memorial Gardens, Inc.*, 588 S.W.2d 309 (Tenn.App.1979). Criminal contempts are directed against the dignity and authority of the court and tend to bring the court into disrepute or disrespect. *O'Brien v. State ex rel. Bibb,* 26 Tenn.App. 270, 170 S.W.2d 931 (1942). While there is a split of authority on the question of whether a court has the authority to impose punishment for civil contempt on its own motion, see *Rodriguez v. Rodriguez*, 245 So.2d 765 (La.App. 4th Cir.1971) and *Hall v. Hall*, 485 So.2d 747 (Ala.App.1986), the general rule seems to be that, since the sanction is imposed for a party's benefit, the party has the power to waive that bene-

fit. If a party does not seek to hold the opposing party in contempt, the court cannot impose civil sanctions on its own motion. See 17 Am.Jur.2d Contempt § 170.

*Id.* at 519; *accord Pickern v. Pickern,* No. E2004–02038–COA–R3–CV, 2005 WL 711964 at *6 (Tenn.Ct.App.E.S., Mar. 29, 2005); *Sanders v. Sanders,* No. 01A01–9601–GS–00021, 1997 WL 15228 at *2 (Tenn.Ct.App.M.S., Jan. 17, 1997)(stating "While the courts may impose criminal contempt sanctions on their own initiative, they may not impose civil contempt sanctions unless a party has requested them."). We therefore hold the trial court erred in sanctioning Mr. Battleson for civil contempt on its own motion. In so holding, we are in no way saying Mr. Battleson's conduct was not contemptuous; however, in order for the trial court to make that determination, Ms. Battleson must first file a petition for contempt and provide proper notice to Mr. Battleson. *Pickern,* 2005 WL 711964 at *6.

■ Ms. Battleson correctly points out that the award of attorney's fees and expert deposition costs were expenses discretionary with the trial court, which could have awarded them to her absent a contempt finding. *See* T.C.A. § 36–5–103(c) (authorizing award of attorney's fees); Tenn. R. Civ. P. 54.04(2)(authorizing reasonable and necessary expert witness fees for depositions). However, Rule 54.04(2) specifically provides that "a party requesting discretionary costs *shall* file and serve a motion within thirty (30) days after entry of judgment." [Emphasis added]. *See also Massachusetts Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 36 (Tenn.Ct.App. 2002)("As a general matter, a party seeking these costs must file a timely motion and must support this motion with an affidavit detailing these costs . . ."). No such motion was filed, and accordingly the award of expert deposition fees was in error.

■ Regarding attorney's fees, the general rule is that a court may award attorney's fees as a sanction for a properly made finding of contempt. *See Reed v. Hamilton,* 39 S.W.3d 115, 119–20 (Tenn. Ct.App.2000); *Overnite Transportation Co. v. Teamsters Local Union No. 480,* 172 S.W.3d 507, 510–11 (Tenn.2005). Under the circumstances of the present case, however, where Ms. Battleson made no request for a contempt holding or attorney's fees, nor did she file a written pleading requesting general relief prior to the hearing where the trial court made its *sua sponte* civil contempt finding, we believe it was error to award her attorney's fees.

### C. Clarification of Prior Order

■ Mr. Battleson also argues that the trial court erred in modifying the parenting plan contained in the original divorce decree to eliminate his one week per month parenting time with Sundae, the younger child. At issue is Mr. Battleson's visitation time, as provided in the parenting plan, of "the week or weeks per month during the time father is off from work." This off-work time consisted of one week per month, during which time Mr. Battleson was "on call" as a commercial pilot. Pursuant to the trial court's earlier judgment, Mr. Battleson's one week per month parenting time ended when the "school schedule" began, which occurred, in the words of the original parenting plan, "when each children [sic] begins kindergarten." At the beginning of the hearing, Ms. Battleson orally advised the court that she was seeking a clarification of this provision, stating through her counsel as follows:

The only question that we would have, assuming you left the parenting plan in its effect, as is, the question of what-now

that one's in school and one's not in school, what Your Honor intended from the parenting plan that you entered. Because remember, this was a tried case. And there's some splitting of the children, but that is a legal question just reading your parenting plan. And what I mean is that the son started school, so he only comes every other weekend. The female child is not in school yet. Prior to their both starting school, they would come over one full week a month. So now, we have the little girl coming the one full week a month and the little boy is on an every other weekend visitation schedule. That may have been what you intended. You'll just have to read the parenting plan and decide.

After the hearing, but before the trial court entered its written order, Ms. Battleson renewed her request, filing a motion "for an Order modifying the parenting plan as it relates to holidays and to clarify all other parenting times." As we have noted in Section I above, the trial court ruled that Mr. Battleson would not be entitled to the one week per month with Sundae. It is apparent from the trial court's comments that it considered this ruling a clarification or interpretation of the parenting plan, and not a modification. We note in this regard that the provision at issue, as written in the parenting plan, does not make sense on its face and requires clarification. It was within the province of the trial court to clarify, interpret or explain what it meant in its prior order, and we do not believe it was error for the trial court to have done so in this case. *See* Tenn. R. Civ. P. 60.01.

### D. Recusal

On appeal, Mr. Battleson argues that this court should hold that the trial judge, Chancellor Richard Johnson, should be disqualified from hearing any further

matters in this case, arguing that "for the Trial Judge to be so incensed, virulent and vitriolic in his findings and conclusions, demonstrates an inability to give fair consideration to future matters in this case." The general rule regarding recusal of a trial judge is that "[t]he decision of whether recusal is warranted must in the first instance be made by the judge himself or herself." *Kinard v. Kinard,* 986 S.W.2d 220, 228 (Tenn.Ct.App.1998); *Eldridge v. Eldridge,* 137 S.W.3d 1, 7 (Tenn.Ct.App. 2002). Thus, because Mr. Battleson has made no request to Chancellor Johnson to recuse himself, this issue is premature and inappropriate for appeal.

We do note that the following comments from the *Eldridge* court are particularly apt and pertinent in this regard:

In order to disqualify a judge, the bias or prejudice must come from an extrajudicial source and not result from the judge's impressions during trial. *Id.* If this were not the case, a judge who makes a ruling adverse to one of the parties would be subject to charges of bias and prejudice. *Id.* Indeed, "adverse rulings by a trial court are not usually sufficient grounds to establish bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Alley v. State,* 882 S.W.2d 810, 821–22 (Tenn.Crim.App.1994) (citations omitted); *But see Hoalcraft v. Smithson,* No. M2000–01347–COAR10CV, 2001 WL 775602, *16, 2001 Tenn.App. LEXIS 489, at *50–54 (Tenn.Ct.App. July 10, 2001) (*no perm. app. filed*) (stating that the cumulative effect of the trial judge's "repeated misapplication of fundamental, rudimentary legal principles in ways that favored Mr. Smithson substantively and procedurally" prompts

an objective concern regarding the judge's impartiality).

* * *

Disqualification is not warranted when the judge's impersonal prejudice arises from the judge's background experience. *Id.* Judges will generally have strong feelings about certain conduct and behavior. *Id.* "When the judge perceives that one party or the other has engaged in that conduct, the party should not be surprised that he/she has incurred the judge's wrath." *Id.*

*Eldridge,* 137 S.W.3d at 7–8. Trial judges sitting as trier of fact are expected and required to make determinations of credibility and character. As *Eldridge* suggests, that a trial judge will occasionally make such a determination forcefully, or even angrily, should not be a source of surprise, nor a source of concern, except perhaps in the most extreme circumstance.

### V. Conclusion

For the aforementioned reasons, the judgment of the trial court holding Mr. Battleson in civil contempt and awarding Ms. Battleson costs and attorney's fees as sanctions is reversed. The judgment of the trial court is in all other respects affirmed. Costs on appeal are assessed to the Appellant, Dean L. Battleson.