IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2015 Session

## DEBORAH MILLER GENTILE v. MICHAEL CHARLES GENTILE

**Appeal from the Chancery Court for Williamson County**
**No. 32768      Robbie T. Beal, Chancellor**

_____

**No. M2014-01356-COA-R3-CV – Filed December 9, 2015**
_____

This case involves the modification of a permanent parenting plan. Father asked the trial court to name him the primary residential parent, alleging a material change in circumstance. The court denied the request to change the primary residential parent, finding Father had failed to meet his burden of proof, but nonetheless modified the parties' residential parenting schedule. On appeal, Father argues the trial court applied the wrong standard in determining whether a material change had occurred and erred in finding he had not met his burden of proof. We affirm the trial court's finding that Father did not prove a material change in circumstance sufficient to justify a change in the primary residential parent; however, we find proof of a material change of circumstance sufficient to meet the lower standard for modification of the residential parenting schedule. Because in modifying the residential parenting schedule the trial court failed to consider the relevant factors in Tennessee Code Annotated § 36-6-106(a), we reverse in part and remand with instructions for the trial court to make a determination of whether it is in the child's best interest to modify the residential parenting schedule and, if so, to modify the schedule accordingly.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

P. Edward Schell, Franklin, Tennessee, for the appellant, Michael Charles Gentile.

Dana C. McLendon III, Franklin, Tennessee, for the appellee, Deborah Miller Gentile.

## OPINION

### I. FACTS AND PROCEDURAL HISTORY

Deborah Miller Gentile ("Mother") and Michael Charles Gentile ("Father") were divorced on October 16, 2008. The parties have one child, Reagan, born in 2005. Mother is the primary residential parent. Under the original parenting plan, Father has 100 days of parenting time, which he exercises every other weekend during the school year and on certain designated holidays. Father also has three weeks of parenting time in the summer.

In February 2009, Mother notified Father of her plans to move with Reagan to Atlanta, Georgia. Father petitioned the trial court to stop the move. Subsequently, Father amended his petition to include a request for modification of the parenting plan. Father alleged a material change in circumstance and sought to be named primary residential parent. A few months later, Mother abandoned her plans to relocate and moved to dismiss Father's petition. Father opposed the motion to dismiss.

With the court's permission, Father filed an Amended Petition for Modification of Parenting Plan. In his amended petition, Father again alleged a material change in circumstance. Father detailed a variety of ways in which Mother had violated the parties' parenting plan. Father alleged Mother had failed to maintain health insurance for the child, facilitate phone conversations between Father and child, follow the "right of first refusal" provisions, and provide proof of child care expenses. Father further alleged Mother had interfered with Father's parenting time, did not ensure proper dental care, allowed the child to miss too many days of school, and was not financially responsible.

After a number of discovery disputes, the Chancery Court for Williamson County held a hearing on Father's amended petition on April 3, and 4, 2014. Both parents, two of Reagan's teachers, her elementary school principal, one of Reagan's stepsisters, and two friends of Father testified at the hearing.

Father works as a consultant for Nissan. His job does not involve travel. Mother, on the other hand, often travels for work. She is an independent representative in the children's apparel and gift business, and she has a showroom in Atlanta, Georgia. Mother has three grown children from a previous marriage. While Father lives alone, Mother shares her home

with her oldest daughter, Maggie; Maggie's son, Owen; and Reagan.

Both parents have a good relationship with Reagan, but Mother and Father do not get along with each other. They have never had a cordial co-parenting relationship, and they only communicate through email messages.

One area of conflict relates to a provision of the parenting plan, which the parties refer to as "the right of first refusal." The provision provides as follows:

> If either parent's work requires them to be away from home for more than forty-eight hours, that the parent who would have parenting time but who will be away shall offer the time that they will be away to the other parent.

The Order granting the parties' divorce contains a similar provision.[1]

Mother has never offered Father the opportunity to care for Reagan when she has gone out of town for work. In Mother's view, the right has never been triggered. According to Mother, she schedules her business trips, as much as possible, during Reagan's time with Father.

Using Mother's cell phone records for the previous five years, however, Father showed Mother had been out of town on numerous occasions since their divorce for more than forty-eight hours. For example, Mother's phone records revealed that she left her home in Franklin on February 17, 2012, and did not return until February 27. During that same period, Father had Reagan from February 24 through 27. Mother never offered Father the opportunity to care for Reagan during the period from February 17 through 24.[2]

---

[1] The Order provides:

> The Court further finds that it is in Reagan's best interest that if either parent's work requires them to be away from home for more than forty-eight hours, that the parent who would have parenting time but who will be away shall offer the time that they will be away to the other parent to spend with Reagan.

[2] Father provided similar testimony, based on Mother's phone records, for several other time periods. On each occasion, Mother's phone records revealed she was out of town, but Father testified he was not offered the opportunity to keep Reagan. However, Father did exercise his parenting time during some of these time periods.

Reagan also missed school Friday, February 17; Monday, February 20; Tuesday, February 21; and Wednesday, February 22. Although she admitted her daughter was not sick during this period, Mother sent a note to Reagan's school, asking for these absences to be excused due to illness. On cross-examination, Mother also admitted she sent notes to school "a few times a year" indicating Reagan was sick, when in fact she was not.

Mother's out-of-town travel cannot be attributed solely to pleasure trips. Mother admitted as much, and Father presented proof that some of Mother's trips corresponded with various trade shows at which Mother was listed as a presenter.

While Mother conceded she was out of town on the dates indicated in her phone records, she did not agree that the "the right of first refusal" clause was triggered. Mother interpreted the right of first refusal language as only requiring her to offer Father the opportunity to keep their daughter if Mother was going to be away from Reagan for forty-eight hours or more. In Mother's view, if she takes Reagan with her on a business trip, leaves Reagan for fewer than forty-eight hours, or is traveling for pleasure, the clause is not triggered. For example, if Mother leaves on business on a Thursday and Reagan is scheduled to be with Father for the weekend, Mother would argue she is not absent from Reagan for more than forty-eight hours and the right of first refusal is not triggered.

Father also complained of other violations of the parenting plan. The parenting plan guarantees Father the right to "receive from the other parent, in the event the other parent leaves the state with the minor child . . . for more than two (2) days, an itinerary including telephone numbers for use in the event of an emergency." Father testified that, when Mother takes Reagan with her out of town, he does not receive the required notice of the trip. For her part, Mother testified she always notifies Father when Reagan will be out of town for more than two days, typically by email. Father's review of Mother's phone records revealed Mother often sent the messages after she and Reagan had already left town. Mother explained when she travels with Reagan, intending to return before two days have elapsed, she does not notify Father. However, sometimes she chooses to extend their stay. In those cases, she notifies Father as soon as she decides to stay out of town for more than two days.

The parenting plan grants the right to "unimpeded telephone conversations with the child at least twice a week at reasonable times and for reasonable durations." Father testified that only rarely has he been able to exercise this right, which he interprets as permitting him to call every day. He could not recall missing a day since the divorce, and he kept a detailed log of every phone call. Father claimed he was often unable to reach Reagan by phone. When he did speak with Reagan, he complained the calls were cut off. Father believed his

4

phone conversations were cut short because Mother forced their daughter to end the call, but he could not verify this.

Mother denied she has interfered with Father's telephone conversations with Reagan. Mother testified that, immediately following the divorce, she called Father every Tuesday and Thursday. After she dialed the call, Mother would give Reagan the phone to speak with Father. However, after she gave Reagan her own cell phone, and following the advice of a doctor, Mother allowed Reagan to decide when or if to call Father.

Finally, the parenting plan requires Mother to obtain health insurance coverage for Reagan and to furnish "proof of continuing coverage . . . annually or as coverage changes." Father presented proof of lapses in Reagan's health insurance coverage.[3] After Reagan's coverage had lapsed several times, Father added Reagan to his insurance coverage through his employer, apparently without informing Mother. Father has maintained coverage for Reagan, at his own expense, since late 2011.

Although Father had obtained health insurance for Reagan, Mother testified she never used that coverage. She explained that, at one point, she allowed Reagan's insurance to lapse so she could enroll Reagan in TennCare. Mother also testified all of Reagan's medical needs were being met.

In addition to the alleged violations of the parenting plan, Father expressed concerns about Reagan's school attendance and Mother's ability to meet her financial obligations. In kindergarten, Reagan was absent fifteen days and marked tardy[4] seven times. In first grade, Reagan was absent twenty days and tardy ten times before she was withdrawn[5] from school by her Mother in March or April of that year. In second grade, Reagan had sixteen absences and nine tardies. Between August 7, 2013, and February 25, 2014, Reagan missed six days of school and had five tardy notations.

Father testified Reagan has never been tardy or absent from school when she is in his care. Mother admitted that, when she has taken Reagan to Atlanta with her for work, Reagan

---

[3] Mother purchased coverage for Reagan through Blue Cross/Blue Shield of Tennessee. According to the records at Blue Cross, Reagan had insurance coverage for seven months in 2008, three months in 2009, eight months in 2010 and four months in 2011.

[4] At Reagan's school, tardy means arriving to school late or being dismissed early.

[5] Mother homeschooled Reagan after withdrawing her from school.

has missed either a Friday or a Monday at school. Mother also admitted she had received letters from school concerning Reagan's attendance.

As for her financial situation, Father described Mother as "indigent." Mother, who worked on commission, conceded the "last couple of years h[ad] been some pretty tough years." Some of the companies she represented had gone out of business, and it had put her "in some financial difficulties." As of the date of the hearing, she had not filed tax returns for the years 2010, 2011, and 2012, but she believed her gross income for 2013 "was around $33,000."[6] Mother had relied on financial assistance from her mother for the last three years to make ends meet. However, Mother believed things were "looking up."

At the conclusion of the hearing, the trial court denied Father's petition and made oral findings of fact and conclusions of law, which were incorporated by reference in a written order. The court concluded that Father had failed to prove a material change of circumstance sufficient to justify a change in the primary residential parent. While refusing to change the primary residential parent, the court did order other modifications to the parenting plan. According to the court, "although Mrs. Miller has not filed a pleading with the Court requesting any modifications of the Parenting Plan, the Plan nevertheless needs to be 'tweaked' in order to 'make it work.'" Among the "tweaks," the court changed the parenting time for Father during Reagan's summer vacation from "one week . . . in June, one week in July and one week in August" to alternate weeks.

## II. ANALYSIS

On appeal, Father raises two issues: (1) whether the trial court applied the wrong legal standard in determining whether a material change in circumstance had occurred and (2) whether the trial court erred in its finding that Father failed to meet his burden of proof. Mother requests that we affirm the decision of the trial court, even if made in error, on the ground that the decision "is manifestly in the best interest of the parties' child that the custody arrangement ordered by the trial court be maintained."

We review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings themselves,' appellate courts 'are reluctant to second-guess

---

[6] At the time of the divorce, Mother's gross monthly income was $10,500.

a trial court's decisions.'" *In re Alexandra J. D*., No. E2009-00459-COA-R3-JV, 2010 WL 5093862, at \*3 (Tenn. Ct. App. Dec. 10, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). We review the trial court's conclusions of law de novo with no presumption of correctness. Tenn. R. App. P. 13(d).

A. MODIFICATION OF PRIMARY RESIDENTIAL PARENT

Once a permanent parenting plan is incorporated in a final divorce decree, absent an agreement, the parties must comply with it unless it is modified by the court. Tenn. Code Ann. § 36-6-405(b)(2014). Tennessee courts apply a two-step analysis to requests for either a modification of the primary residential parent or the residential parenting schedule. *See, e.g., In re T.R.Y.*, No. M2012-01343-COA-R3-JV, 2014 WL 586046, at \*11-12 (Tenn. Ct. App. Feb. 12, 2014) (primary residential parent modification); *In re C.R.D.*, No. M2005-02376-COA-R3-JV, 2007 WL 2491821, at \*6 (Tenn. Ct. App. Sept. 4, 2007) (parenting time modification). The threshold issue is whether a material change in circumstance has occurred since the court's prior order naming a primary residential parent. Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2015). Only if a material change in circumstance has occurred do we consider whether a change in primary residential parent is in the child's best interest by examining the statutory best interest factors.[7] *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). The "determination of whether a material change of circumstances has occurred" and where the best interests of the child lie are factual questions. *Armbrister*, 414 S.W.3d at 692-93; *see also In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

The parent requesting a change in custody has the burden of proving a material change in circumstance by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). By statute,

> [a] material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

---

[7] In 2014, the General Assembly amended Tennessee Code Annotated § 36-6-404(b) by replacing its list of factors with the best interest factors found in Tennessee Code Annotated § 36-6-106(a). 2014 Tenn. Pub. Acts 351. Even prior to the amendment, the analysis under the two statutes was "quite similar." *See Armbrister*, 414 S.W.3d at 697. The hearing in this case took place before the effective date of the 2014 revisions.

7

*Id.* In determining whether a material change has occurred, the court should consider: "(1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way." *Cranston,* 106 S.W.3d at 644. Not every change in circumstance is a material change. "The change must be significant before it will be considered material." *In re T.C.D.*, 261 S.W.3d at 744.

When the issue before the court is a modification of the residential parenting schedule, the threshold for establishing a material change in circumstance is much lower. *See Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007); *see also* Tenn. Code Ann. §§ 36-6-101(a)(2)(B), -101(a)(2)(C). The petitioner still must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest, and the change must have occurred after entry of the order sought to be modified. *Caldwell v. Hill*, 250 S.W.3d 865, 870 (Tenn. Ct. App. 2007). However, unlike the standard for a change of primary residential parent, whether the change was reasonably anticipated when the prior residential parenting schedule order was entered is irrelevant. *Armbrister*, 414 S.W.3d at 703. To modify a residential parenting schedule, "merely showing that the existing arrangement [is] unworkable for the parties is sufficient." *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006).

Father argues the trial court applied the wrong legal standard in this case. The court explained that, to be a material change, the change had to affect the child and "[t]he proof is with the child." The court also found Father had failed to meet his burden by not showing how Reagan had been adversely impacted by the change in circumstance. Father concludes from these and similar statements that the trial court must have applied a substantial harm test, which has been expressly abrogated by statute. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B). We disagree. Based upon our review, we conclude the trial court applied the proper legal standard.

With regard to school attendance, the court found the absences and tardiness did not rise to the level of a material change because "there has not been what would appear to be an impact on the child educationally." Although Reagan had missed a number of days of school, all the witnesses testified Reagan is bright and does well in school. Even the school principal testified Reagan's absences had not affected her school work. Excessive absences from school may amount to a material change in circumstances, but ordinarily the petitioner should show how the absences impacted the child. *See e.g., Bumpus v. Bumpus*, No. W2007-00395-COA-R3-CV, 2008 WL 763780, at *14 (Tenn. Ct. App. Mar. 25, 2008) (stating Father presented evidence that child was behind in school because of excessive tardies when

in mother's care); *Groce v. Groce*, No. M2008-01516-COA-R3-CV, 2009 WL 3295269, at *4 (Tenn. Ct. App. Oct. 13, 2009) (finding excessive absences affected the children's academic progress).

As for Mother's failures to comply with the parenting plan, the court also found such failures did not amount to a material change in circumstance. The court concluded the "right of first refusal" provision left "plenty of room for interpretation" and accepted Mother's interpretation of the provision. Perhaps more importantly, the court found Mother's interpretation of the provision to be motivated by a desire to spend more time with her child, rather than a desire to deprive Father of parenting time. Additionally, the court found Mother was not interfering with Father's telephone conversations with Reagan. The court determined the current telephone arrangement simply was not working. On this point, clearly, the court accepted Mother's testimony that she did not interfere with the calls and that she encouraged Reagan to call Father. We give great deference to the trial court's findings with regard to credibility of witnesses, *In re Alexandra J. D.*, 2010 WL 5093862 at *3, and we will not overturn such findings absent clear and convincing evidence to the contrary. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

On Mother's finances, even though Mother's income has clearly changed for the worse since the divorce, the court found no proof Reagan was actually lacking any necessities or had otherwise been adversely impacted. Mother testified Reagan's needs had been met, and Father admitted Mother had fed and clothed Reagan and provided for both her needs and for extracurricular activities. The proof in the record is that, in a financially difficult time, Mother obtained help from a relative and cut back on some expenses. We do not find the evidence preponderates against these findings.

We have consistently held that, before changing the primary residential parent, the petitioner must prove the alleged changes affected the child's well-being in a meaningful way. *Williams v. Williams*, No. E2004-00964-COA-R3-CV, 2005 WL 524810, at *2 (Tenn. Ct. App. Mar. 7, 2005) (finding the evidence showed the child was well-adjusted and unaffected by the alleged changes); *Gervais v. Gervais*, No. M2005-01483-COA-R3CV, 2006 WL 3258228, at *6 (Tenn. Ct. App. Nov. 9, 2006) ("Without evidence that the [change] . . . affected the child's well-being, a material change of circumstances was not proved."); *Birdwell v. Harris*, No. M2006-01919-COA-R3-JV, 2007 WL 4523119, at *7 (Tenn. Ct. App. Dec. 20, 2007) ("the evidence does not preponderate against the trial court's conclusion that Father failed to prove such a material change of circumstances affecting the child's well-being in a material way as would compel the court to conduct a comparative fitness or best interest inquiry, or to justify the 'drastic remedy' of changing custody."). Here, Father failed to show Reagan had been affected in a meaningful way by the changes in circumstance. As

such, the court properly denied Father's request to name him the primary residential parent.

## B. MODIFICATION OF THE PARENTING PLAN

Although it dismissed Father's petition for modification of the parenting plan, the court proceeded to make several changes to the parenting plan, including modifying the residential parenting schedule without specifically finding a material change of circumstance or considering the best interest of the child. A trial court may clarify ambiguous provisions of its previous orders. *See Battleson v. Battleson*, 223 S.W.3d 278, 287-88 (Tenn. Ct. App. 2006) (stating the trial court could clarify or interpret a provision in the parenting plan). However, by statute, before modifying a residential parenting schedule, the court first must find a material change in circumstance. Tenn. Code Ann. § 36-6-101(a)(2)(C); *Wilson v. Baines*, No. M2009-00249-COA-R3-CV, 2009 WL 4175862, at *3 (Tenn. Ct. App. Sept. 18, 2009). Once a material change of circumstance sufficient to justify a change in residential parenting schedule has been found, the court must then consider whether modification of the schedule is in the best interest of the child. Tenn. Code Ann. §§ 36-6-101(a)(2)(C), 36-6-405(a); *Armbrister*, 414 S.W.3d at 705.

Here, the court's modifications to the parenting plan were more than mere "tweaks" or clarifications. *See Wilson*, 2009 WL 4175862 at *4 (rejecting the argument that the trial court had merely "tweaked" the final custody order when it "changed the days and amount of visitation given to the parties."). The court changed the parties' parenting schedule in the summer to alternating weeks. In doing so, the court expressly recognized Father would receive additional parenting time. The court also changed the Christmas parenting schedule.

While the trial court found, and we agree, no material change in circumstance sufficient *to justify changing the primary residential parent*, this record includes sufficient evidence of a material change of circumstance *to modify the parenting schedule*. The threshold for finding a material change to modify a parenting schedule is low. *Rose*, 2006 WL 2390980, at *2 n.3. A finding that the current plan is not working is enough. *Id.*; *see Rigsby v. Edmonds,* 395 S.W.3d 728, 737 (Tenn. Ct. App. 2012) (holding evidence did not support a finding of material change to transfer custody, but did support a modification of the parenting schedule); *Schreur v. Garner*, No. M2010-00369-COA-R3-CV, 2011 WL 2464180, at *5 (Tenn. Ct. App. June 20, 2011) (determining mother had met her burden of proof under the lower threshold even though trial court had not made a material change determination).

At the time of the divorce, Reagan was three years old. She is now in school. Traveling with Mother has caused Reagan to have a "significant number" of absences, and

Mother seemingly has difficulty getting Reagan to school on time or she is picking Reagan up early. As the trial court expressed, this situation is a concern. Mother and Father also do not work well together in parenting. In light of these facts, we find a material change of circumstance sufficient to modify the residential parenting schedule.

However, the finding of a material change of circumstance does not end the inquiry. *Armbrister*, 414 S.W.3d at 705. Here, the trial court conducted no best interest analysis, and on this record, we decline to do so. On remand, the court should consider the factors in Tennessee Code Annotated § 36-6-106(a) and make a determination of whether it is in Reagan's best interest to modify the residential parenting schedule. After examining Reagan's best interest, the court may again adopt the modified schedule in its order or another schedule that serves the child's best interest.

### III. CONCLUSION

We affirm the trial court's finding that Father did not meet his burden of proving a material change in circumstance justifying a change in the primary residential parent, but we conclude the trial court erred in modifying the residential parenting schedule. Although the proof showed a material change of circumstance under the lower standard for modifying a residential parenting schedule, the trial court failed to consider the child's best interest. Therefore, we reverse that portion of the court's order that modifies the parties' residential parenting schedule, namely the change in the summer and Christmas [8] vacation parenting schedules. We remand with instructions for the trial court to examine the factors under Tennessee Code Annotated § 36-6-106(a) to determine whether modifying the parenting schedule is in the child's best interest and, if so, to adopt a modified a parenting schedule that serves the child's best interest.

_____
W. NEAL MCBRAYER, JUDGE

---

[8] Given that winter vacation is rapidly approaching, the Christmas visitation schedule ordered by the trial court should remain in effect for the current year. On remand, the court should consider whether this change and the change in the summer parenting schedule serve the child's best interest for future years.