FILED
05/29/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 18, 2018 Session

## GRAHAM CLARK ET AL. v. TIMOTHY CURTIS JOHNSON

**Appeal from the Chancery Court for Sullivan County**
**No. 16-CK-40744(M)     John S. McLellan, III, Judge[1]**

---

### No. E2017-01286-COA-R3-CV

---

In this case involving grandparent visitation, the petitioners, Graham Clark and Marisa Clark ("Grandparents"), filed a petition in the Sullivan County Juvenile Court ("juvenile court") in November 2016, approximately thirteen months after the death of their daughter, Megan Clark Johnson ("Mother"), who was the mother of the four minor children at issue here. Naming the children's father, Timothy Curtis Johnson ("Father") as the respondent, Grandparents averred that the children were dependent and neglected due to the death of Mother in October 2015 and an allegedly severe reduction in Grandparents' visitation with the children since December 2015. The case was subsequently transferred to the Sullivan County Chancery Court ("trial court"), with Grandparents having given notice to Father that they were seeking relief in the form of grandparent visitation. The trial court thereafter treated the petition as one for grandparent visitation. Following a hearing, the trial court entered a temporary order directing that Grandparents would enjoy unsupervised visitation with the children on alternate weekends. Following a subsequent bench trial, the trial court granted visitation to Grandparents upon finding that, pursuant to Tennessee Code Annotated §§ 36-6-306 and -307 (2017) (collectively, the "Grandparent Visitation Statute"), their visitation and relationship with the children had been severely reduced over several months prior to the petition's filing and that such reduction posed a risk of substantial emotional harm to the children. Also finding that it was in the best interest of the children to grant Grandparents a set visitation schedule, the trial court ordered overnight visitation one weekend a month and two additional nights monthly, as well as one week's uninterrupted visitation in the summer and the sharing of major holidays. Father timely appealed. Having determined that the evidence preponderates against a finding that the reduction in Grandparents' visitation and relationship with the children in the months preceding the petition's filing met the statutory definition of a severe reduction, we reverse.

---

[1] Sitting by interchange.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Nicholas A. Schaefer, Kingsport, Tennessee, for the appellant, Timothy Curtis Johnson.

Randall D. Fleming, Kingsport, Tennessee, for the appellees, Graham Clark and Marisa Clark.

**OPINION**

I. Factual and Procedural Background

The facts underlying this action are essentially undisputed. Father and Mother were married in 2006 and had four children either born to them or adopted by them: M.J., who was ten years of age at the time of trial; E.J., who was six years of age; L.J., who was four years of age; and M.M.J., who was two years of age (collectively, "the Children"). Although Mother had suffered from health problems spanning several years, testimony during trial indicated that Mother's death on October 21, 2015, came following a sudden decline in Mother's health that had not been expected by the parties.

At all times relevant to this case, Grandparents resided in Kingsport, Tennessee. According to Grandmother's testimony, Mother and Father initially resided in Dandridge, Tennessee, and were living there when Mother underwent brain surgery in 2006. Mother and Father then relocated to Knoxville, where Father had obtained employment, and remained there until 2009. According to Father's testimony, the adoption of the eldest child, M.J., was finalized in 2009 while Father and Mother were living in Knoxville. It is undisputed that when Father and Mother resided in Knoxville, Grandparents visited them often, as well as welcoming them often to visit in Kingsport.

Mother became pregnant in late 2009, and Father, Mother, and M.J. subsequently moved into Grandparents' residence so that Grandparents could offer assistance to the parents. During the pregnancy, Mother suffered complications that required her to remain on bed rest for several months. During this time period, Father was initially employed with a company in Dandridge, but he subsequently obtained employment with Nyrstar, a mining company in Jefferson City, Tennessee, which required him to commute approximately 100 miles between his work and Grandparents' residence in Kingsport. According to Grandmother, Mother and Father stayed with Grandparents for approximately eight to nine months during Mother's pregnancy and while she was

2

recovering from the birth of E.J., who was born in June 2010.  Following E.J.'s birth, Father, Mother, M.J., and E.J. returned to their former residence in Knoxville.  Father and Mother subsequently adopted L.J. and M.M.J., and Grandparents continued to visit back and forth with the family.

In 2013, Father and Mother relocated to Dandridge, renting a home there.  Undisputed testimony demonstrated that Grandparents, especially Grandmother, spent a great deal of time with the Children during this time period and maintained a close relationship with Mother and Father as well.  Grandmother testified that she was no longer employed by 2013 and would "help out with" the Children "probably every day" during the work week.  She stated that Father, Mother, and the Children also visited at Grandparents' home often and that Father "was a very big part of our family."  Prior to her death in October 2015, Mother was in a coma for several days, and Grandparents undisputedly assisted Father in caring for the Children during this difficult time.  Grandmother also testified that Father, Mother, and the Children had moved into a home they had newly purchased three weeks prior to Mother's death, although the record is not clear as to the location of this new home, where Father and the Children continued to live at the time of trial.

Following Mother's death, Grandmother provided care to the Children daily during the work week to facilitate Father's return to work after a short leave of absence.  Father acknowledged during trial that soon after Mother's death and for a few weeks thereafter, Grandparents cared for the Children overnight at Grandparents' residence approximately two nights a week.  Father testified that although several people assisted him in caring for the Children while he returned to work, Grandmother "was instrumental in helping [him] with the kids during that time."  For his part, Grandfather, who was a high school football coach, testified that as his work schedule allowed, he had "dropped in" at Father's home on many occasions to visit the Children in the months following Mother's death.  Grandfather also interacted with M.J. regularly during football season because M.J. volunteered as a ball boy for the team coached by Grandfather.

In December 2015, Father hired as a nanny a woman, S., who previously had cared for the Children as a babysitter.[2]  S. moved in with Father and the Children in the spring of 2016, and she and Father became engaged in July 2016.  Father testified during the May 3, 2017 trial that he and S. were to be married two weeks after trial.  When questioned regarding when he believed his relationship with Grandparents had begun to deteriorate, Father stated that he believed it was when he and S. had become engaged.

---

[2] Throughout the record, S. is referred to only by her given name.  Because she is not a party and did not testify at trial, we will refer to S. in this opinion solely by her first initial in an effort to protect her privacy.  No disrespect is intended.

Although Grandparents have acknowledged throughout these proceedings that they continued to see the Children well after December 2015, they have asserted that the nature of the visitation Father allowed them gradually changed from individual quality time and overnight stays at Grandparents' home to mere invitations to attend the Children's events and activities, such as M.J.'s football games, with many people present. Grandparents also maintain that Father's responses to inquiries regarding the Children became increasingly delayed. Grandparents acknowledge that a compilation of text messages they presented at trial demonstrated that one or both Grandparents visited with one or more of the Children on more than forty occasions in the eleven months preceding the petition's filing. Grandmother and Grandfather each respectively testified that Father had not refused a requested visit to either of them without providing a reason such as a prior engagement.

In September 2016, Father received a letter, dated September 13, 2016, from Grandmother's former counsel, stating in substantive part:

> Please be advised that I have been retained by [Grandmother] in order to assist her in seeing her grandchildren. Please contact myself, or [Grandmother], to arrange same so that we can avoid litigation in this matter.

Included in the text message conversations presented during trial was the following exchange between Father and Grandmother, dated September 25, 2016:

Father: I received a letter from your attorney, but I haven't heard from you in 2 months . . .

Grandmother: It says to call me so We can work out visitation.

Father: You've never been not allowed to see the kids . . . all you have to do is ask.

Grandmother: Ok I would like to set up a schedule where I get all four kids one day a week, one weekend a month, and time with all of them on their birthdays and holidays, and a week in the summer. I would like this in writing as advised per my attorney. I would be glad to discuss this over a telephone call or in person.

| | |
|---|---|
| Father: | If you would like to see the kids then let me know and we'll work out a time you can come visit them, but I'm not going to have a schedule with you. |
| Grandmother: | It's obvious we're having communication issues and I would like to lay out a day a week I can have them over to my house so I would like a schedule. I would prefer to talk about this in person or on the phone. |
| Father: | I understand what you are requesting, but it would be better for our family to provide you our schedule so that you could then find the best time for yourself to come over and visit them. |
| Grandmother: | I'll be glad to work with your family to find what time is best for you all, but I would like to take them to my house to spend time with them with me and my family, the way I always have. |
| Father: | Your family is also welcome to come over here and visit with them. |

On November 1, 2016, Grandparents filed a petition in the juvenile court, alleging that the Children were dependent and neglected due to Mother's death and the subsequent, purportedly severe reduction in Grandparents' visitation. Pursuant to the Grandparent Visitation Statute, Grandparents sought "a reasonable visitation schedule" and "a rebuttable presumption of substantial harm to the [Children] based upon the cessation or severe reduction of the relationship between the children and the grandparents." The juvenile court entered an order on November 2, 2016, appointing attorney Kenneth E. Hill as guardian *ad litem* to represent the Children.

Upon Grandparents' subsequent motion filed in the juvenile court, the action was transferred to the trial court via an order entered December 22, 2016, which was signed by both the juvenile court judge and the presiding chancellor. The transfer order does not state a reason for the transfer, but email correspondence among court personnel, Grandparents' trial counsel, and the guardian *ad litem*, attached to the transferred juvenile court file, indicates that a judicial conflict existed because the "3 judges/magistrates" usually hearing cases in the juvenile court all knew Grandfather. Upon transfer, the trial court treated the petition as one for grandparent visitation.

On January 20, 2017, Grandparents filed a notice of mediation set for February 6, 2017, but Father, who was not yet represented by counsel, did not appear for that mediation. Grandparents then filed a notice of hearing set for March 1, 2017. Father's counsel subsequently filed a notice of appearance on February 28, 2017, as well as a motion to continue. Following a hearing conducted on March 1, 2017, the trial court entered an order on March 13, 2017, granting Father's motion to continue the hearing on the petition but also setting a temporary visitation schedule for Grandparents of alternating weekends with the Children. The parties subsequently participated in mediation in April 2017 but were unable to reach an agreement.

The trial court conducted a bench trial on May 3, 2017, hearing testimony from the parties, as well as several witnesses who testified regarding the close and loving relationship between Grandparents and the Children. The trial court subsequently entered an order on May 31, 2017, granting Grandparents' request for visitation and setting forth a visitation schedule. In granting visitation, the trial court found that Father had severely reduced Grandparents' visitation and relationship with the Children. The court further found that Grandparents had successfully raised and Father had failed to rebut the statutory rebuttable presumption of substantial harm to the Children if visitation were not granted. *See* Tenn. Code Ann. § 36-6-306(b)(4) ("[I]f the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation or severe reduction of the relationship between the child and grandparent.").

Having determined that a denial of visitation to Grandparents posed a danger of substantial emotional harm to the Children, the trial court then considered the factors delineated in Tennessee Code Annotated § 36-6-307 (2017) to determine that granting Grandparents' petition for a set visitation schedule would be in the best interest of the Children. The trial court set the visitation schedule as follows:

> [Grandparents] shall have overnight visitation with [the Children] each month beginning June 2017 on the third weekend of each month, from Friday at 5:00 p.m. until Sunday at 5:00 p.m. If the parties can agree, the Court will consider an alternate weekend to permit flexibility due to the parties' and [the Children's] activity schedules and plans.

> [Grandparents] shall have two additional overnight visitations each month at a time to be agreed upon by the parties consistent with the children's schedule of activities and school or by further Order of the Court if agreement cannot be reached.

[Grandparents] shall have the [Children] for a minimum period of seven days during their summer vacation in the month of June or July of each year upon reasonable notice to [Father] this year, and notice by May 1 beginning 2018 and each year thereafter.

[Grandparents] shall share major holidays such as Thanksgiving and Christmas with the [Children] as may be determined by agreement of the parties, consistent with family traditions, or by further Order of the Court.

(Paragraph numbering omitted.) Father timely appealed.[3]

## II. Issue Presented

Father presents one issue on appeal, which we have restated slightly as follows:

Whether the trial court correctly applied the legal standard required by the Grandparent Visitation Statute to find that Grandparents' visitation and contact with the Children had been opposed or severely reduced by Father.

## III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward,* 27 S.W.3d 913, 916 (Tenn. 2000); *Hadjopoulos v. Sponcia*, No. E2015-00793-COA-R3-CV, 2016 WL 1728250, at *5 (Tenn. Ct. App. Apr. 28, 2016) (explaining that the evidentiary standard in grandparent visitation cases is a preponderance of the evidence). However, we review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). "A determination of visitation 'often hinges on subtle factors such as the [parties'] demeanor and credibility during the trial proceedings.'" *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013) (quoting *Battleson v. Battleson*, 223 S.W.3d 278, 282 (Tenn. Ct. App. 2006)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

---

[3] In a footnote in their appellate brief, Grandparents state that sixty days following entry of the trial court's order, Father informed them that he planned to relocate with the Children. Noting that Grandparents have not filed a motion for consideration of post-judgment facts pursuant to Tennessee Rule of Appellate Procedure 14, we decline to consider purported facts occurring after the judgment and outside the record. *See* Tenn. R. App. P. 13(c).

We review issues of statutory interpretation *de novo*, adhering to the following longstanding principles:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).

IV.  Subject Matter Jurisdiction

As a threshold issue, we address, *sua sponte*, whether the trial court, as a chancery court, properly exercised subject matter jurisdiction to consider Grandparents' petition upon transfer from the juvenile court when Grandparents' petition alleged dependency and neglect and no resolution of such an allegation had been adjudicated in the juvenile court. *See* Tenn. R. App. P. 13(b) (explaining that although "[r]eview generally will extend only to those issues presented for review," "[t]he appellate court shall also consider whether the trial and appellate court[s] have jurisdiction over the subject matter, whether or not presented for review . . . ."). Pursuant to Tennessee Code Annotated § 37-

1-103 (2017), exclusive, original subject matter jurisdiction over dependency and neglect proceedings is vested solely in juvenile courts. This exclusive jurisdiction continues until either "(1) the case is dismissed; (2) the custody determination is transferred to another court; (3) a petition for adoption is filed; or (4) the child reaches the age of eighteen." *In re D.Y.H.*, 226 S.W.3d 327, 330 (Tenn. 2007).

In the case at bar, we determine that Grandparents' petition alleged dependency and neglect in name only. In reviewing pleadings, we "must give effect to the substance, rather than the form or terminology of a pleading." *Stewart v. Schofield*, 368 S.W.3d 457, 463 (Tenn. 2012) (citing *Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 104 (Tenn. 2010)). In the petition, Grandparents specifically alleged in relevant part:

> The minor children are dependent and neglected in that [Mother was] deceased on October 21, 2015 and the maternal grandparents['] time with the children has drastically been reduced. Prior to their daughter's deceasing, [Grandparents] were very active in raising the minor children.
>
> * * *
>
> [Grandparents] are seeking a reasonable visitation schedule with their minor grandchildren pursuant to T.C.A. §36-6-306 [and] a rebuttable presumption of substantial harm to the child based upon the cessation or severe reduction of the relationship between the children and the grandparents.

In substance, Grandparents asserted a cause of action based on the Grandparent Visitation Statute and requested the sole relief of a "reasonable visitation schedule."

The record demonstrates that once this case had been transferred from the juvenile court to the trial court, the trial court treated Grandparents' petition as one for grandparent visitation. No allegations of dependency and neglect were heard during trial, and Grandparents presented no evidence suggesting neglect or abuse of the Children by any person involved in these proceedings. Inasmuch as chancery courts are authorized to exercise non-exclusive subject matter jurisdiction over petitions for grandparent visitation involving children born to or adopted by a married couple, *see* Tenn. Code Ann. § 36-6-306(a), we conclude that the trial court properly exercised subject matter jurisdiction.

9

V.  Severe Reduction in Grandparent Visitation and Relationship

Father contends that the trial court erred by finding that he had severely reduced Grandparents' visitation and relationship with the Children.  He asserts that because either a custodial parent's opposition to a grandparent's visitation or a custodial parent's severe reduction in such visitation is a condition precedent to application of the Grandparent Visitation Statute, the trial court improperly applied Tennessee Code Annotated § 36-6-306(b)(1) to find that the Children would be subjected to substantial harm if visitation were not granted to Grandparents.  He thereby also argues that the trial court erred by proceeding to the best interest analysis.  Grandparents acknowledge that Father never directly opposed their visitation with the Children.  However, they contend that the trial court properly found that Father had severely reduced their visitation in the months prior to the petition's filing, prompting further analysis under the Grandparent Visitation Statute and the trial court's ultimate grant of visitation.  Upon a thorough review of the record and applicable authorities, we conclude that the evidence preponderates against a finding that Grandparents' visitation with the Children was severely reduced according to the applicable statutory definition.

The applicable version of Tennessee Code Annotated § 36-6-306(a) (2017) delineates the circumstances in which a hearing is necessary concerning a petition for grandparent visitation, providing:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents or custodian <u>or if the grandparent visitation has been severely reduced by the custodial parent or parents or custodian</u>:
>
> > (1) The father or mother of an unmarried minor child is deceased;
> >
> > (2) The child's father or mother are divorced, legally separated, or were never married to each other;
> >
> > (3) The child's father or mother has been missing for not less than six (6) months;
> >
> > (4) The court of another state has ordered grandparent visitation;

(5)     The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent, parents, or custodian (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child); or

(6)     The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance or severe reduction of the relationship, this relationship was severed <u>or severely reduced</u> by the parent, parents, or custodian for reasons other than abuse or presence of a danger of substantial harm to the child, and severance <u>or severe reduction</u> of this relationship is likely to occasion substantial emotional harm to the child.

(Emphasis added.)[4]

The underlined language above regarding a severe reduction in visitation was added to the Grandparent Visitation Statute by the General Assembly in an amendment that took effect on May 20, 2016. *See* 2016 Tenn. Pub. Acts, Ch. 1076 § 1 (H.B. 1476) ("the 2016 Amendment"). Inasmuch as this action was commenced in November 2016, the 2016 Amendment applies. This Court has previously noted the effect of the 2016 Amendment in providing that "grandparent visitation could be ordered not only in situations where a custodial parent opposes visitation, but also where 'visitation has been severely reduced by the custodial parent[.]'" *See Coleman v. Olson*, No. M2015-00823-COA-R3-CV, 2016 WL 6135395, at *16 n.6 (Tenn. Ct. App. Oct. 20, 2016), *perm. app. granted* (Tenn. Mar. 9, 2017) (citing Tenn. Pub. Acts, Ch. 1076 § 1 (H.B. 1476)). In *Coleman*, this Court applied the previous version of the Grandparent Visitation Statute because the *Coleman* action was commenced prior to the effective date of the 2016 Amendment. *Id.* As of the date of the instant opinion's filing, our research has revealed no prior Tennessee appellate decision in which the 2016 Amendment to the Grandparent Visitation Statute has been applied.

In this case, Grandparents averred in their petition that they had a significant existing relationship with the Children, that their visitation had been severely reduced, and that Mother was deceased. Grandparents therefore averred purported facts in the

---

[4] We note that effective April 18, 2018, following commencement of the instant action, the General Assembly amended Tennessee Code Annotated § 36-6-306(a) by adding the phrase, "other courts with domestic relations jurisdiction" to follow "general sessions courts with domestic relations jurisdiction." *See* 2018 Tenn. Pub. Acts, Ch. 734 § 1 (S.B. 2002).

petition that necessitated a hearing pursuant to Tennessee Code Annotated § 36-6-306(a)(1) and (6).  Once the evidence had been presented, an award of visitation in this case could not properly be made without a threshold finding that the Children were in danger of substantial harm based on either a cessation of or a severe reduction of the relationship between the Children and Grandparents prior to the petition's filing.  *See* Tenn. Code Ann. § 36-6-306(b) (2017).

The trial court found that the relationship had been severely reduced pursuant to Tennessee Code Annotated § 36-6-306(b), which provides as pertinent to the issue raised on appeal:

> (b)(1)  In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child.  Such finding of substantial harm may be based upon cessation <u>or severe reduction</u> of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:
>
> > (A)  The child had such a significant existing relationship with the grandparent that loss <u>or severe reduction</u> of the relationship is likely to occasion severe emotional harm to the child;
> >
> > (B)  The grandparent functioned as a primary caregiver such that cessation <u>or severe reduction</u> of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or
> >
> > (C)  The child had a significant existing relationship with the grandparent and loss <u>or severe reduction</u> of the relationship presents the danger of other direct and substantial harm to the child.
>
> * * *
>
> (4)  For the purposes of this section, if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation <u>or severe reduction</u> of the relationship between the child and grandparent.

(Emphasis added.) The repeated underlined phrase, "or severe reduction," was added by the General Assembly as part of the 2016 Amendment. *See* 2016 Tenn. Pub. Acts, Ch. 1076 §§ 2-3 (H.B. 1476).

We note that Grandparents' proof in this regard must have established that a severe reduction in the relationship occurred prior to the petition's filing. *See Uselton v. Walton*, No. M2012-02333-COA-R3-CV, 2013 WL 3227608, at *13 (Tenn. Ct. App. June 21, 2013) (holding under the previous version of the statute that "[i]f the custodial parent did not oppose grandparent visitation before the petition for court-ordered grandparent visitation is filed, evidence of the custodial parent's conduct *after* the petition is filed cannot establish the threshold element of opposition."); *see also Coleman*, 2016 WL 6135395, at *18. Applying this precedent with the added language of the 2016 Amendment, we determine that any reduction in Grandparents' relationship with the Children subsequent to the petition's filing would be outside the relevant time period for the threshold finding of a severe reduction. Because Grandparents asserted that a gradually increasing reduction in their visitation began in mid-December 2015, the relevant time period for an analysis of whether a severe reduction occurred spans a little less than eleven months, from mid-December 2015 through November 1, 2016, the date of the petition's filing.

The Grandparent Visitation Statute also provides criteria for analyzing whether a grandparent and child have a "significant existing relationship" and clarifies that the proof of such a relationship need not include expert testimony. *See* Tenn. Code Ann. § 36-6-306(b)(2)-(3). In the case at bar, Father does not raise an issue regarding the finding of a significant existing relationship between Grandparents and the Children, having acknowledged during his testimony that such a relationship had been established and continued to be beneficial to the Children. When questioned regarding whether it was in the Children's best interest to continue to have visitation and contact with Grandparents, Father responded, "Absolutely." Instead, Father's argument focuses on the trial court's threshold finding that triggered the rebuttable presumption of substantial harm to the Children. Father argues that Grandparents failed to carry their initial burden of establishing, by a preponderance of the evidence, that he had severely reduced Grandparents' visitation during the relevant time period. *See* Tenn. Code Ann. § 36-6-306(b)(1). We agree with Father on this point.

It is well established in Tennessee that parents, barring a judicial finding of a risk of substantial harm to the children involved, enjoy a fundamental constitutional right to raise their children as they see fit. *See Troxel v. Granville*, 530 U.S. 57, 66-72 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 577-82 (Tenn. 1993). As this Court has explained under a previous version of the Grandparent Visitation Statute:

Some background on grandparent visitation is helpful. The decisions of the U.S. Supreme Court and the Tennessee Supreme Court, interpreting the federal and state constitutions, explicitly prohibit any judicial assumption that grandparent/grandchild relationships always benefit the child, as contrary to the parents' fundamental right to raise their children as they see fit. *See Troxel v. Granville*, 530 U.S. 57, 66-72, 120 S.Ct. 2054, 147 L.Ed .2d 49 (2000) (recognizing parents' fundamental constitutional right to make decisions on care, custody and control of children, finding trial court erred in presuming grandparent visits are in best interest of children); *Hawk v. Hawk*, 855 S.W.2d 573, 577-82 (Tenn. 1993) (recognizing parents' fundamental constitutional right, finding trial court engaged in "sentimental" commentary on grandparents and erred in "unquestioning judicial assumption" that grandparent-grandchild relationship always benefits child, basing award of grandparent visitation on that presumed benefit). To avoid such an assumption, the Tennessee constitution and Tennessee's grandparent visitation statute require a grandparent seeking visitation to prove, as a threshold requirement, that the child will be in danger of substantial harm if visitation is not ordered by the court. *Hawk*, 855 S.W.2d at 581; Tenn. Code Ann. § 36-6-306(b)(1). Both the federal constitution and Tennessee's grandparent visitation statute require the petitioning grandparent to show that visitation was opposed or denied in order for the court to consider ordering visitation. *Troxel*, 530 U.S. at 71 (trial court erred in giving no weight to fact that parent had assented to some grandparent visitation under certain conditions); *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *7-8 (Tenn. Ct. App. Oct. 22, 2008) (in light of parents' fundamental right, Tennessee grandparent visitation statute "is not implicated" unless visitation is denied or opposed). Under *Troxel*, pursuant to the federal constitution, in all phases of a proceeding on grandparent visitation, there is a presumption that a fit parent is acting in the child's best interest, and the court must accord special weight to the parent's determinations. *Troxel*, 530 U.S. at 68, 70 (plurality opinion) ("there is a presumption that fit parents act in the best interests of their children.") (if a fit parent's decision on grandparent visitation "becomes subjected to judicial review, the court must accord at least some special weight to the parent's own determination.").

*Green v. Evans*, No. M2011-00276-COA-R3-CV, 2012 WL 1107887, at *8 (Tenn. Ct. App. Mar. 30, 2012). *See generally Lovlace*, 418 S.W.3d at 26 ("Showing substantial harm is the specific and sole manner in which grandparents in this State may overcome the constitutional deference initially afforded parental decisions regarding grandparent visitation.").

As relevant to this action, the 2016 Amendment changed the threshold requirements for application of the Grandparent Visitation Statute insofar as the trial court may now consider ordering visitation upon a showing by the petitioning grandparent that visitation, and as a result the grandparent-grandchild relationship, was severely reduced rather than requiring that visitation must have been opposed or denied by the custodial parent. *See* 2016 Tenn. Pub. Acts, Ch. 1076 §§ 1-3 (H.B. 1476).

The 2016 Amendment also provided the following statutory definition:

> For purposes of this section, "severe reduction" or "severely reduced" means reduction to no contact or token visitation as defined in § 36-1-102.

Tenn. Code Ann. § 36-6-306(f) (2017); Tenn. Pub. Acts, Ch. 1076 § 4 (H.B. 1476). Tennessee Code Annotated § 36-1-102(1)(C) (2017), cross-referenced in the Grandparent Visitation Statute's definition of "severe reduction," provides:

> "[T]oken visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]"

Although the threshold element of a severe reduction in visitation and thus the grandparent-grandchild relationship has not yet been addressed in Tennessee appellate decisions applying the Grandparent Visitation Statute, Tennessee appellate courts have applied the statutory definition of token visitation within the context of actions to terminate parental rights. As this Court has noted, "[w]hether visitation is 'token' under this definition is a fact-intensive inquiry to be decided on a case-by-case basis," which "requires that we examine the frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d 731, 748-50 (Tenn. Ct. App. 2010), *perm. app. denied* (Tenn. Feb. 17, 2011). "'[T]oken' visitation means either perfunctory visitation or visitation of such an infrequent nature as to establish minimal contact with the child." *In re M.T.*, No. W2002-03050-COA-R3-CV, 2003 WL 22351012, at *4 (Tenn. Ct. App. Oct. 14, 2003) (emphasis omitted).

In the context of parental rights termination, this Court has determined that visits are "perfunctory" when the parent "was merely physically present at visits and uninterested" in the child. *In re Keri C.*, 384 S.W.3d at 750 (citing *DCS v. L.L.T.*, No.E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003)). In the context of grandparent visitation allowed by a custodial parent, however, we note that the perfunctory nature of a visit would more likely be characterized by

superficiality in the type of visit the grandparent is allowed. *See In re Keri C.*, 384 S.W.3d at 750 n.9 (citing the Webster's Dictionary definition of "perfunctory" in relevant part as "characterized by routine or superficiality:  done merely as a duty . . . .").

In determining that the relationship between Grandparents and the Children had been severely reduced, pursuant to Tennessee Code Annotated § 36-6-306(b), by a severe reduction in Grandparents' visitation, pursuant to subsection -306(a), the trial court made the following specific findings of fact in pertinent part:

[W]hile [Mother] and [Father] resided in Kingsport, [Grandmother] saw the children nearly every day and helped [Father] and his wife with the care of their minor children and there developed a very tight bond between the grandparents and the children.

That [Mother] continued to have health issues and major surgeries over the years since her marriage to [Father], which often necessitated [Grandparents'] assistance both in Knoxville and in their home in Kingsport to their daughter, [Father] and their grandchildren over an approximate nine year period.

That [Mother] had an onset of illness resulting in her being in a coma for an extended period of time until she subsequently died on October 21, 2015.

[Father's] employment was approximately 100 miles from his residence in Kingsport which caused him to leave early in the morning and not be available at home until later in the evening during the period of his wife's serious health issues and surgeries which necessitated [Grandparents'] assistance prior to and subsequent to [Mother's] death when [Grandparents], along with [Father's] parents, provided care in Knoxville to allow [Father] sufficient time to make arrangements regarding daily care of the children while maintaining his employment.

That approximately one month after [Mother's] death, [S.] was hired as a Nanny and moved in with the children and [Father] in Knoxville, Tennessee.

That [S.] was 18 years old at the time of her employment and [Grandparents] were concerned about the Nanny's "maturity" which became a point of controversy between [Grandparents] and [Father] who was 33 years of age.

16

That shortly after moving in to [Father's] home with the children, [S.] and [Father] began dating, subsequently became engaged, and [Father] testified at the hearing of this matter that they were to be married ". . . two weeks from this Saturday."

That [Grandparents] testified that around December, 2015, it became more difficult to see their grandchildren and that there was a severe diminution of [Grandparents'] time with the children, causing [Grandparents] to secure the services of an attorney who on September 13, 2016, sent a letter to [Father] concerning the issue of [Grandparents'] "visitation with the grandchildren" which [Father] considered to be a "bullying" tactic.

In response, [Father] told [Grandmother] by telephone to be grandparents that prayed for them and he would let her know when she could see the kids after which texting became the main means of communication between [Grandparents] and [Father] in an ever increasing hostile relationship.

That when [Grandmother] would attempt to contact [Father], he would either not respond to the calls or would take days to reply to her e-mails concerning visitation with the children and other related matters.

That [Father] contends Collective Exhibit 2, which is a compilation of texts from November 19, 2015 through October 17, 2016, reflects that [Grandparents] saw one or more of the grandchildren twenty-eight times.

That [Father's] text of September 25, 2016, which was in response to the letter from [Grandparents'] attorney, states that all they had to do was ask for time with the children and "I'm not going to have a schedule with you" which reflects his stated position at the time of hearing and increase in hostility between the parties observed by the Court during these proceedings.

That Collective Exhibit 3 reflects texts from the period of February 25, 2016 through October 21, 2016 and Collective Exhibit 5 reflects texts between [Father] and [Grandfather] from the period of January 28, 2016 through October 23, 2016, from all of which, including texts in Exhibit 2, [Father] contends there are approximately forty visitations during an eleven month period.

17

That [Grandparents] are requesting <u>individual time</u> with the grandchildren rather than having time with their grandchildren along with a crowd of individuals at events or fulfilling requests for assistance reflected in several instances of their time with one or more of the grandchildren reflected in Collective Exhibits 2, 3, and 5.

That [Father] removed the photos of [Mother] from the children's rooms which had been redone approximately three months prior to [Mother's] death, which "hurt" [Grandmother].

That the children are still grieving and devastated by the loss of their mother as shown by the unrebutted testimony that at [Grandparents'] home the children take books to show to [Mother's] pictures, converse with [Mother] through her pictures, take toys to show to [Mother's] pictures, and [E.J.] goes to bed with her mother's picture.

That while [Grandfather's] availability to have visitation with his grandchildren was limited by his employment as a coach for . . . High School, subsequent to his daughter's death he would "drop by" [Father's] home unannounced to visit the children, which was never refused, but with the Father's request being that [Grandfather] would call to advise when he was "dropping by" prior to his arrival.

That [Grandfather's] visitation with the grandchildren increased since his daughter's death, his grandson [M.J.] was a "ball boy" for [the high school's] football games and the grandfather attended [M.J.'s] games when he was available.

That the Father does not oppose [Grandparents'] visiting their grandchildren, but due to his work schedule, the weekends are the only time he has with his children and he does not want a "schedule" of timesharing.

That [Father] testified that it is in the children's best interest to have a relationship with [Grandparents] and that his children need and want to see their grandmother.

That it is [Father's] opinion that it is important for the children to maintain continuity and meet their current personal activity schedules in which [M.J.] plays baseball, [E.J.] plays softball, and [L.J.] plays soccer,

and that at times he needs a break and could use help from the grandparents.

That it was [Father's] opinion that "things did not go south until the engagement" with [S.].

(Paragraph numbering and internal citations to record omitted.)

In its conclusions of law in the final order, the trial court cited Tennessee Code Annotated § 36-6-306(a)(1) and (6) as applicable and found:

As stated by [Father], things went "south" upon his engagement to [S.]; however, prior to the engagement, severe reduction in grandparent visitation began in December 2015, as [Father's] and [S.'s] relationship grew and animosity increased between the parties as there was less "individual time" for the grandparents with their grieving grandchildren.[5]

The court then addressed the rebuttable presumption provided in subsection -306(b), stating:

It is undisputed that the grandparents enjoyed a significant relationship with their grandchildren, primarily through the grandmother, which was almost daily time in assisting with the care and nurturing of their daughter's family during the many medical issues and surgeries [Mother] and her family endured from the time of her marriage in 2006 until her death October 21, 2015.

Next, the court quoted the statutory definition of "severe reduction," *see* Tenn. Code Ann. § 36-6-306(f), and found in pertinent part:

That since December 201[5],[6] the visitation of the grandparents has been severely reduced, as heretofore found by the Court, and has become insubstantial contact compared to the previous "individual" relationship

---

[5] We note that the phrase, "going south," was actually coined by Grandparents' trial counsel during cross-examination, rather than stated by Father. In answer to counsel's question, "When did things start going south between you and [Grandparents]," Father responded, "Probably around the time of mine and [S.'s] engagement."

[6] The trial court appears to have inadvertently stated the year as 2016 after finding previously in the order that visitation had been reduced since December 2015. We note also that the trial court's quotation of Tennessee Code Annotated § 36-6-306(f) begins on page 48 of the technical record and continues on page 50. Although the final order itself is not paginated, it is clear from the text of the order and the trial court's paragraph numbering that pages 49 and 50 were inverted when placed in the technical record.

between the grandparents and grandchildren. The father has failed to rebut the presumption of substantial harm to the grandchildren which is "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not," but it "need not be inevitable." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The record is ample with unrebutted proof from the parties and [Grandparents'] witnesses of a strong and emotional bond between the grandchildren and [Grandparents], especially with their grandmother who has been one of the primary care givers for a substantial period of the lives of the grandchildren.

(Emphasis added.) The trial court then proceeded to analyze whether awarding visitation to Grandparents would be in the best interest of the Children pursuant to the statutory factors provided in Tennessee Code Annotated § 36-6-307.[7]

---

[7] Tennessee Code Annotated § 36-6-307 provides:

In determining the best interests of the child under § 36-6-306, the court shall consider all pertinent matters, including, but not necessarily limited to, the following:

(1)    The length and quality of the prior relationship between the child and the grandparent and the role performed by the grandparent;

(2)    The existing emotional ties of the child to the grandparent;

(3)    The preference of the child if the child is determined to be of sufficient maturity to express a preference;

(4)    The effect of hostility between the grandparent and the parent of the child manifested before the child, and the willingness of the grandparent, except in case of abuse, to encourage a close relationship between the child and the parent or parents, or guardian or guardians of the child;

(5)    The good faith of the grandparent in filing the petition;

(6)     If the parents are divorced or separated, the time-sharing arrangement that exists between the parents with respect to the child;

(7)    If one (1) parent is deceased or missing, the fact that the grandparents requesting visitation are the parents of the deceased or missing person;

(8)    Any unreasonable deprivation of the grandparent's opportunity to visit with the child by the child's parents or guardian, including denying visitation of the minor child to the grandparent for a period exceeding ninety (90) days;

(9)    Whether the grandparent is seeking to maintain a significant existing relationship with the child;

Upon our careful review of the final order and the record as a whole, we determine that the trial court incorrectly interpreted the statutory definition of "severe reduction" to include what the court termed, "insubstantial contact compared to the previous 'individual' relationship between the grandparents and grandchildren." In this tragic situation, Grandparents were undisputedly of great assistance to Father and to the Children during Mother's final illness and the weeks following her death. Grandparents had undisputedly established a close relationship with the Children from the time of each child's birth or adoption into the family. Father also does not dispute that during the relevant time period, Grandparents began to be offered less visitation time with the Children. However, the statutory definition does not describe a reduction in visitation in comparison to any visitation the grandparents may have enjoyed previously. The statutory definition of a severe reduction is "reduction to no contact or token visitation as defined in § 36-1-102." Tenn. Code Ann. § 36-6-306(f) (emphasis added). Noting that no evidence in this case would support a finding of no contact allowed by Father, we further determine that the amount and quality of Grandparents' visitation with the Children was never reduced to "token" as that term is defined in Tennessee Code Annotated § 36-1-102. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("When a statute is clear, we apply the plain meaning without complicating the task.").

Grandparents presented evidence of text message conversations demonstrating that at least one of them visited with one or more of the Children on more than forty occasions during the relevant time period. Although Grandmother testified that she began to see the Children less in December 2015, Grandmother also acknowledged that during the 2015 Christmas holiday, the Children visited at Grandparents' home and that Father made them available during the holiday without her having to request a visit. Text message conversations between Grandmother and Father; among Grandmother, Father, and S.; and between Grandfather and Father, when reviewed collectively, reflect that at least the following visits and contacts occurred from January through October 2016:

January 2016:     On January 4, 12, 25, 28, and 29, Grandmother cared for the Children.

On January 28, Grandfather took Father and the Children out to lunch.

_____

(10)     Whether awarding grandparent visitation would interfere with the parent-child relationship; and

(11)     Any court finding that the child's parent or guardian is unfit.

On January 30, Grandmother sent Father a message asking how the Children were doing, and Father responded with a photograph.

February 2016:    On February 3, 4, 10, and 25, Grandmother cared for the Children.

March 2016:    On March 1, 2, 3, and 30, Grandmother cared for the Children.

On March 22, Grandmother transported the Children to an Awanas program (described in testimony as a Christian program "something like Boy Scouts").

On March 23, Grandmother took some of the Children's clothes that she had laundered to them.

April 2016:    On April 2 and 25, Grandmother cared for the Children.

On April 6, Grandmother transported the Children to Awanas.

On April 8, Grandmother cared for L.J.

On April 14, Grandmother sent Father a message, indicating that the Children had sent a videotape of themselves singing "Happy Birthday" to her over the telephone (Father also sent the birthday video to Grandfather).

On April 16, Grandfather visited the Children.

May 2016:    On May 1, Grandparents visited the Children at Father's home.

On May 17, Father sent Grandparents a message with two photographs showing two of the Children while Father and the Children were on vacation.

On May 21, Grandfather sent Father a message inviting the Children to Grandparents' home for a swim; Father stated that two of the Children had been sick but that the other two could visit. Grandfather stated that he knew the Children had been to his home for a swim a couple of times in 2016 but did not remember exactly when.

22

On May 24, Grandmother indicated taking the Children to a movie over the weekend.

On May 24, Father sent Grandparents an invitation to E.J.'s birthday party.

On May 31, Father brought the two youngest of the Children to stay with Grandmother while the two oldest were in summer camp.

June 2016:    On June 2, Grandparents cared for the Children over the weekend.

On June 16, Father brought the Children to Grandparents' home to visit.

July 2016:    On July 6 and 8, Father invited Grandfather to M.J.'s ballgames, but Grandfather's schedule would not allow him to attend.

On July 16, Grandmother cared for the Children.

August 2016:    On August 4, Grandfather indicated to Father that he had enjoyed seeing the family that night.

September 2016:    On September 2 and 16, Father sent Grandfather messages inviting him to M.J.'s ballgames, but Grandfather's schedule did not allow him to attend.

On September 6 and 19, Father sent Grandfather messages inviting him to M.J.'s ballgames, and Grandfather did attend.

October 2016:    On October 1, Grandparents attended a ballgame in which M.J. was playing upon Father's invitation prompted by Grandmother's request to see the Children.

On October 6, Grandfather ate lunch at Father's home.

On October 8, Grandfather and Father exchanged messages regarding M.J.'s ballgame that day.

On October 13, Grandmother visited the Children.

23

On October 14, Grandmother transported M.J. to a ballgame in which he was playing. Grandfather noted that he had seen the Children that day.

On October 15, Grandmother cared for M.J.

On October 22, Grandparents attended a ballgame in which M.J. was playing upon S.'s invitation. Father sent Grandfather photographs of M.J. in his uniform.

Grandfather also testified that he would sometimes drop by Father's home to see the Children and acknowledged that he did not always call or send a text message before doing so. Although Grandmother and Grandfather each respectively testified that it was emotionally difficult for them to visit the Children at the home that had been Mother's home before her death, they also each testified that Father had never refused a requested visit to either of them without offering a reason such as a prior engagement.

We emphasize that "'token' visitation means either perfunctory visitation or visitation of such an infrequent nature as to establish minimal contact with the child." *In re M.T.*, 2003 WL 22351012, at *4 (emphasis omitted). In this case, the frequency of Grandparents' visits with the Children during the relevant time period cannot be considered minimal contact. *See, e.g., In re Jayden B.T.*, No. E2014-00715-COA-R3-PT, No. 2015 WL 3876573, at *8 (Tenn. Ct. App. June 23, 2015), *perm. app. denied*, (Tenn. Sept. 25, 2015) (determining that the father's twice monthly visits with the child were not token); *In re E.M.P.*, No. E2006-00446-COA-R3-PT, 2006 WL 2191250 at *5 (Tenn. Ct. App. Aug. 3, 2006) (determining that given the "sparse record" on appeal, the record did not contain clear and convincing evidence that Mother's one visit with the child in four months could be characterized as token); *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877 at *9 (Tenn. Ct. App. Oct. 4, 2005) (reversing the trial court's determination that the mother abandoned the child by engaging in only token visitation when the child spent one or two weekends a month with the mother); *cf. In re Keri C.*, 384 S.W.3d at 751 (concluding that visitation during the determinative period of "once-a-month half-hour contacts" with the two-year-old child "at large family gatherings [could] not be viewed as a reasonable attempt to forge a meaningful relationship with the child" and were thus token in nature); *In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 7, 2005) (concluding that the mother's one or two visits with the children in the four months preceding the mother's incarceration were "nothing more than token visitation").

In asserting that the nature of their visits with the Children had changed during the relevant time period, Grandparents are essentially arguing that the visits they enjoyed

with the Children were perfunctory, or superficial in nature, due to their reduced ability to spend individual time with the Children away from public events and activities and in Grandparents' home. We recognize the poignancy of Grandparents' argument and the fact that during the relevant time period, they were no longer able to spend as much individual time with the Children as they had in the past. However, the extent and nature of visits that Grandmother and Grandfather each enjoyed with the Children and their engagement in the Children's lives during the relevant time period cannot be characterized as perfunctory or superficial. Grandmother testified that "what I was asking for was time with them like I had spent with them prior to. I had been with them every day. I'd read books, I'd rocked, I'd talked, I'd taken them places, I'd shared with them in the car." Grandfather acknowledged that Father "did a good job of keeping [him] informed of what was going on with the [Children]" but stated that he and Grandmother "just feel like . . . a schedule is better."

Although the trial court found that Grandparents' visitation and relationship with the Children had been severely reduced in comparison to what it had been in the past, the statutory definition does not call for a simple comparison of the visitation and relationship during an earlier time period with the visitation and relationship during the relevant time period. We conclude that the evidence preponderates against a finding that Grandparents' visitation and relationship with the Children during the relevant period were severely reduced to the point of no contact or token visitation. *See* Tenn. Code Ann. § 36-6-306(f). Inasmuch as no severe reduction in the grandparent-grandchild relationship, as statutorily defined, had been proven by a preponderance of the evidence, the trial court erred in finding a danger of substantial harm to the Children if visitation were not awarded to Grandparents. *See* Tenn. Code Ann. § 36-6-306(b). Having determined that the trial court's finding of a danger of substantial harm to the Children was not warranted, we further determine that any review of the statutory best interest factors is pretermitted as moot. *See* Tenn. Code Ann. § 36-6-306(c) ("Upon an initial finding of danger of substantial harm to the child, the court shall <u>then</u> determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307.") (emphasis added).

Considering also Father's fundamental constitutional right at stake here to make parental decisions, *see Lovlace*, 418 S.W.3d at 26, we reverse the trial court's grant of Grandparents' visitation petition. We note that throughout the record in this case, the close and loving relationship between Grandparents and the Children is evident, as are Father's positive statements concerning the Children's relationship with Grandparents. We urge the parties to continue lending their support to and encouragement of this beneficial grandparent-grandchild relationship despite the absence of court-ordered visitation.

## VI. Conclusion

For the reasons stated above, we reverse the trial court's grant of visitation to Grandparents and dismiss Grandparents' petition in its entirety. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below. The costs on appeal are assessed against the appellees, Graham Clark and Marisa Clark.

_____
THOMAS R. FRIERSON, II, JUDGE

26